IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION



FILED

JAN 3 1 2013

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| SUSAN SHOTT, | |
| Plaintiff, | Case Number: |
| v. | Judge: 13 C 5 0 0 3 0 |
| VEDDER PRICE, | Magistrate Judge: |
| Defendant. | JURY DEMANDED |

## COMPLAINT

Plaintiff Dr. Susan Shott for her Complaint states as follows:

## THE PARTIES

1. Dr. Susan Shott ("Dr. Shott") is physically disabled by severe rheumatoid arthritis and pulmonary hypertension, which is a serious, fatal heart disease. Dr. Shott is a resident of McHenry County, Illinois.

2. Defendant is Vedder Price, an international law office with locations in the United States, including Chicago, New York, and Washington, DC, and in the United Kingdom. Vedder Price operates and owns or leases a law office located in downtown Chicago at 222 North LaSalle Street, Chicago, Illinois 60601.

## JURISDICTION AND VENUE

3. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 12188 and 28 U.S.C. § 1331. The Court may grant declaratory and other relief pursuant to 18 U.S.C. §§ 2201 and 2202.

1

4. Venue is proper in the Northern District of Illinois, Western Division, pursuant to 28 U.S.C. § 1391 because Vedder Price operates a law office in this district and does business in the Western Division of this district; the discriminatory acts have occurred and continue to occur while Vedder Price was and remains in this district and while Dr. Shott was and remains in the Western Division of this district; and Dr. Shott is a resident of the Western Division of this district.

**FACTUAL BACKGROUND**

5. Dr. Shott is an individual with disabilities within the meaning of the ADA. 42 U.S.C. § 12102; 28 C.F.R. § 36.014. Dr. Shott has severe rheumatoid arthritis, which causes stiffness and intense pain like the pain of being burned. Her arthritis affects both hands, both wrists, both elbows, both shoulders, both hips, both knees, both ankles, both feet, and her spine. Her arthritis has also damaged her heart and lungs, and caused an inflammation of her lungs called pleuritis, making it difficult and painful for her to breathe. The spine damage caused by her arthritis has caused significant neurological problems, so that she has coordination problems, a tendency to lose her balance, and constant vertigo. Dr. Shott has had more than 50 surgeries, including heart surgery, because of her arthritis. She also takes medication to treat her arthritis. However, there is no cure for rheumatoid arthritis.

6. Dr. Shott also has pulmonary hypertension, which has caused chronic right-sided heart failure, so that she has shortness of breath, chest pain, and a rapid heart rate with stress or even moderate exertion; pitting edema; fatigue; and marked fluid retention during the day. As a result of her fluid retention, she has to get up to urinate every one to two hours when she sleeps, because her heart is able to eliminate the large amount of excess fluid only when she reduces her heart's workload by lying down. Dr. Shott's pulmonary hypertension is a fatal heart disease that

2

has greatly reduced her life expectancy. Because pollution makes her pulmonary hypertension much worse, Dr. Shott has to live in a less polluted area, and she avoids exposure to pollution as much as possible. Although Dr. Shott takes medication and uses oxygen to treat her pulmonary hypertension, there is no cure for pulmonary hypertension.

7. Dr. Shott's rheumatoid arthritis and pulmonary hypertension are physical impairments, and they substantially limit her performance of many major life activities, including performing manual tasks; walking; engaging in activities that are stressful or require even moderate physical exertion; remaining immobilized, as by sitting or standing, for long periods of time; and major bodily functions including respiratory, cardiac, and immune system functions. Dr. Shott also has a record of having these disabilities. She has had severe rheumatoid arthritis for 26 years and pulmonary hypertension for 14 years.

8. Because Dr. Shott is disabled, she uses a German Shepherd dog that is trained to do work and perform tasks for her, such as acting as a "walking railing" to prevent Dr. Shott from falling when she loses her balance; providing support for Dr. Shott when she sits down and stands up; pulling to help Dr. Shott walk quickly and climb stairs; and transporting her prescription medications and other personal items such as keys, reading glasses, and writing instruments. Dr. Shott's dog is a service animal within the meaning of 28 C.F.R. § 36.104. Dr. Shott has used a service dog for more than 11 years.

9. Based on recommendations from Dr. Shott's physicians, her experience with activities that worsen the functional impairments caused by her disabilities, and the well-known fact that pollution causes functional difficulties and physical harm to individuals with heart disease, including pulmonary hypertension, Dr. Shott does the following to reduce the pain and other symptoms, functional impairment, and physical harm caused by her disabilities:

3

      a.     As much as possible, Dr. Shott avoids traveling for long distances, because traveling requires immobilization that greatly increases the pain and stiffness caused by her rheumatoid arthritis;

      b.     As much as possible, Dr. Shott avoids scheduling stressful activities and activities that require peak performance in the morning, because the pain and stiffness caused by her rheumatoid arthritis are much worse in the morning, and because her pulmonary hypertension and the diuretics she takes for this heart disease make her lightheaded and likely to pass out in the morning; and

      c.     As much as possible, Dr. Shott avoids exposure to pollution, because such exposure causes shortness of breath, chest pain, and extreme fatigue that lasts for at least two days. Increasing the duration or level of pollution that Dr. Shott is exposed to substantially worsens the harmful effects of this exposure.

10.    Vedder Price has been retained by the Rush University Medical Center ("Rush") to represent Rush in an ADA, Title VII, and Section 1981 employment discrimination case ("Rush discrimination case") that was filed pro se by Dr. Shott in this Court on September 9, 2011 (Case No. 11-cv-50253).

11.    From September 9, 2011 to the present, Dr. Shott has represented herself in the Rush discrimination case.

12.    Bruce Alper and Scot Hinshaw are attorneys licensed to practice law in Illinois who are employed by Vedder Price. They are Rush's counsel of record for the Rush discrimination case, which is presently in the discovery process.

## TITLE III OF THE ADA

13.    Title III of the ADA ("Title III") prohibits discrimination on the basis of disability

4

in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, operates, or leases a place of public accommodation. 42 U.S.C. § 12182(a); 28 C.F.R. § 36.201(a).

14. Vedder Price is a place of public accommodation within the meaning of Title III because it is the office of a "lawyer . . . or other service establishment." 42 U.S.C. § 12181(7)(F); 28 C.F.R. § 36.104.

15. For purposes of Title III, discrimination against individuals or classes of individuals with disabilities generally includes, among other things:

    a. Outright denial of the "goods, services, facilities, privileges, advantages, or accommodations" of the entity. 42 U.S.C. § 12182(b)(1)(A)(i); 28 C.F.R. § 36.202;

    b. The imposition or application of eligibility criteria that screen out or tend to screen out an individual on the basis of disability "from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary." 42 U.S.C. § 12182(b)(2)(A)(i); 28 C.F.R. § 36.301(a); and

    c. The "failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii); 28 C.F.R. § 36.302.

## ADA VIOLATIONS

16. In a January 9, 2013 email to Dr. Shott from Mr. Hinshaw, Vedder Price noticed the deposition of Dr. Shott for the Rush discrimination case. Vedder Price scheduled her

5

deposition to take place on February 26, 2013 in downtown Chicago at the office of Vedder Price; to begin at 9:00 in the morning; and (based on a January 28, 2013 email from Mr. Alper to Dr. Shott) to last seven hours. Vedder Price's demand that Dr. Shott give her deposition in this manner will require Dr. Shott to do the following:

    a.    Dr. Shott will have to make a long drive to downtown Chicago, which is heavily polluted, during morning rush hour traffic, which will take at least two and half hours. This prolonged immobilization will greatly increase the severe pain and stiffness caused by her rheumatoid arthritis;

    b.    Dr. Shott will have to make this drive in the morning, when she is already experiencing the increased severe morning pain and stiffness caused by her rheumatoid arthritis, and when she is lightheaded and likely to pass out because of her pulmonary hypertension and the diuretics that she takes for this heart disease;

    c.    Dr. Shott will be exposed to heavy pollution during most of this drive to Chicago and during her deposition, causing her shortness of breath, chest pain, and extreme fatigue that will last for at least two days;

    d.    Dr. Shott will have to give a deposition, a highly stressful experience that requires peak performance, while she is experiencing severe pain and stiffness, shortness of breath, chest pain, and extreme fatigue; and

    e.    After spending at least seven hours in downtown Chicago, Dr. Shott will have to make a long drive from downtown Chicago to her home during afternoon rush hour traffic, which will take at least two and a half hours. This will further increase the severe pain and stiffness caused by her rheumatoid arthritis. Dr. Shott will be exposed to heavy pollution during most of this drive, further worsening her shortness of breath, chest pain, and extreme

6

fatigue.

17. Before Vedder Price scheduled Dr. Shott's deposition, Mr. Hinshaw and Mr. Alper had seen Dr. Shott with her service dog at Court appearances for the Rush discrimination case, and, therefore, knew that Dr. Shott was disabled. On December 7, 2012, Mr. Alper filed Rush's Answer to Dr. Shott's First Amended Complaint in the Rush discrimination case. This Complaint describes in detail Dr. Shott's disabilities and some of the difficulties caused by her disabilities. The Complaint states (p. 3, ¶ 9) that because "pollution makes her pulmonary hypertension much worse, Dr. Shott has to live in a less polluted area, and she avoids traveling to polluted areas as much as possible." The Complaint also states (p. 3, ¶ 10) that because "of her arthritis and pulmonary hypertension, Dr. Shott is substantially limited in her ability . . . to remain immobilized, as by sitting or standing, for a long period of time." Therefore, at the time Vedder Price scheduled Dr. Shott's deposition, Vedder Price knew that it would cause Dr. Shott substantial difficulty because of her disabilities by requiring her to give her deposition in the manner described in the deposition notice.

18. In a January 10, 2013 email to Mr. Hinshaw, Dr. Shott reminded Vedder Price that travel is a problem for her because of her disabilities, especially travel to a highly polluted area such as downtown Chicago. In this email, Dr. Shott also asked Vedder Price to provide the following accommodations of her disabilities when scheduling and conducting depositions for the Rush discrimination case:

    a. Scheduling of depositions in the afternoon, because of difficulties caused by her disabilities, with continuation of Dr. Shott's deposition into the evening if necessary, and with her expectation that the depositions which she will take will require no more than three hours; and

7

  b. Use of video or audio conferencing to take depositions, or scheduling of depositions at a location farther from downtown Chicago.

  19. Mr. Hinshaw did not respond to Dr. Shott's January 10, 2013 email to him.

  20. In two January 15, 2013 emails to Mr. Hinshaw (cc'd to Mr. Alper and Deborah Sullivan, legal secretary to Mr. Hinshaw), Dr. Shott provided Vedder Price with two PDF files containing a total of 391 pages of medical records and other medical documents, including her physician's deposition testimony, letters from her physicians, and an affidavit from her physician. These medical documents were provided as part of discovery for the Rush discrimination case. They verify that Dr. Shott has severe rheumatoid arthritis and pulmonary hypertension, that she is disabled within the meaning of the ADA, that she has a record of having these disabilities, and that she needs accommodations of her disabilities.

  21. In the first of these January 15, 2103 emails, Dr. Shott again requested that Vedder Price accommodate her disabilities. Her email states:

> I have not yet received a reply of any kind, from you or anyone else at Vedder Price, to my January 10, 2013 email request that Vedder Price provide accommodations of my disabilities that I need in order to give a deposition in this case and to take depositions in this case. Please let me know whether Vedder Price is willing to provide these accommodations of my disabilities.

  22. Mr. Hinshaw did not respond to Dr. Shott's January 15, 2013 emails to him.

  23. In a January 16, 2013 email to Mr. Hinshaw (cc'd to Mr. Alper and Ms. Sullivan), Dr. Shott stated that she had received no reply from Mr. Hinshaw or anyone at Vedder Price to her last three emails to him.

  24. On January 16, 2013, Mr. Alper responded to this email with an email to Dr. Shott (cc'd to Mr. Hinshaw, Ms. Sullivan, and Rush in-house counsel David Rice) which stated that he had received the medical documents that Dr. Shott had emailed to Mr. Hinshaw and that he

8

would respond to her "email concerning location of depositions in the next day or so."

25. On January 18, 2013, despite Vedder Price's receipt of extensive medical records and other medical documents concerning Dr. Shott, Mr. Alper sent Dr. Shott an email (cc'd to Mr. Hinshaw and Mr. Rice) which objected to her request that Vedder Price accommodate her disabilities. In this email:

    a. Mr. Alper demanded that Dr. Shott give him detailed medical reasons for her disability accommodation requests;

    b. Mr. Alper objected to Dr. Shott taking depositions of Rush personnel anywhere except in downtown Chicago at Rush or his office;

    c. Mr. Alper stated that he would "consider" having Dr. Shott depose Rush personnel remotely through audio or video conference only on a case-by-case basis, and that Dr. Shott would have to pay for this accommodation;

    d. Mr. Alper stated that he expected his deposition of Dr. Shott to take "some time" and that he preferred to "do it during normal business hours;" and

    e. Mr. Alper claimed that the fact that Dr. Shott has to travel to Rush to pick up her paychecks is inconsistent with her request that Vedder Price accommodate her disabilities.

26. Although Dr. Shott is employed by Rush as a senior faculty member in the Rush Medical College, she has to work at home because of her disabilities, using telephone and email to communicate with her colleagues and others at Rush. This method of working is extremely efficient and is also used by Rush faculty members who are not disabled.

27. On January 21, 2013, Dr. Shott sent Mr. Alper an email (cc'd to Mr. Hinshaw and Mr. Rice) which stated:

This is in response to your 1/18/13 email, which I received in response to my

9

1/10/13 email asking Vedder Price to accommodate my disabilities, severe rheumatoid arthritis and serious heart disease (pulmonary hypertension). . . .

[M]y 1/10/13 email offers a solution that accommodates my disabilities and enables Vedder Price attorneys and Rush administrators to be wherever they wish during the depositions: We can carry out the depositions by video or audio conferencing. As an experienced attorney, you know that depositions are often taken in this manner, even when it is not necessary to do so to accommodate disabilities. Such arrangements are frequently more convenient for everyone. . . .

[F]or the following reasons, there is no basis for your notion that because I have to pick up my paychecks at Rush, you are entitled to conclude that I do not have disability-related problems that would be worsened by traveling to Chicago and spending half a day or an entire day there for a deposition.

1) Because I have rheumatoid arthritis, this paycheck arrangement causes me severe pain and stiffness due to the immobilization required to make the long trip to Chicago and back.

2) My exposure to heavy pollution during this trip causes shortness of breath, chest pain, and extreme fatigue that lasts for at least two days.

3) These are typical problems for a person with my disabilities. It is well known that immobilization causes pain and stiffness in people with rheumatoid arthritis. It is also well known that pollution is very harmful to people with heart disease and worsens their heart disease symptoms. I had to move away from Chicago in order to reduce the harm that pollution was causing me because of my pulmonary hypertension. Having my residence outside of heavily polluted areas is necessary for me to survive and to function.

4) For these reasons, I pick up my paychecks as infrequently as possible, at most once a month and sometimes every six weeks or two months. This means that I have to wait much longer to be paid than other Rush employees, who receive their paychecks every two weeks or twice a month.

5) Rush has given me no reasonable alternative for obtaining my paychecks. Direct deposit would be a bad choice for me. In order to have my paychecks directly deposited into my bank account, I would have to sign a form that authorizes Rush to take money from my account by calling this a "correction" (see the attached authorization form). Given Rush's prolonged discrimination and retaliation against me, it would be foolish for me to give Rush the right to take money from my bank account.

6) Rush has lost my paycheck 21 times. If I signed up for direct deposit, Rush could "lose" my paychecks by refusing to deposit them, then claiming that they

did deposit them and my bank made an error. Sorting out the resulting electronic nightmare could take months, during which I would not be paid at all. When Rush "loses" my paper paycheck, the fault clearly lies with Rush and Rush is obligated to find or replace my paycheck.

7) Given Rush's continued discrimination and retaliation against me after two Federal Court judgments against it, I have good reason to believe that direct deposit would result in an unacceptably high risk that Rush would substantially delay paying me.

8) Mailing my paychecks to me is not a reasonable alternative. When Rush claimed that it had mailed two of my paychecks to me (without my permission to do so), one check took about two weeks to arrive and the other never showed up and had to be replaced.

9) When I asked Rush whether I could leave prepaid Fed Ex envelopes with Rush in order to send my paychecks to me securely, Rush refused to do so.

Finally, you have demanded a detailed medical explanation of why I need Vedder Price to accommodate my disabilities by scheduling my deposition (and the depositions that I will take) in the afternoon. Here are the medical reasons:

1) As described above, my rheumatoid arthritis causes me severe pain and stiffness after immobilization. This includes the immobilization that occurs while sleeping. It is well known that people with rheumatoid arthritis have increased pain and stiffness when they get up in the morning. In my case, the increased pain and stiffness last at least eight hours. Giving or taking a deposition in the morning would require me to do so while experiencing severe pain and stiffness.

2) The diuretics that I take for my heart disease often cause my blood pressure to be too low in the morning. This drop in blood pressure, and the heart disease itself, make me light-headed in the morning. I often need to sit down and relax for a bit to avoid passing out. Although I can compensate for this to some degree by increasing some of my arthritis and heart medications, I cannot compensate enough to deal well with an extremely high-stress situation such as giving or taking a deposition. It is well known that people with heart disease frequently have this problem.

Since you prefer to take my deposition during "normal" business hours, I will be happy to give my deposition in two afternoons instead of one day in order to enable you to do this.

Giving or taking a deposition is obviously a high-stress event that requires peak performance. There is no legitimate reason for Vedder Price to put me at a substantial disadvantage by refusing to accommodate my disabilities and thereby

worsening the medical problems they cause.

The best and most convenient solution for everyone would be for me to give and take depositions by video or audio conferencing.

I will be happy to provide you with possible dates for my deposition. Before I can do so, however, I need to know whether Vedder Price will accommodate my disabilities.

28. As of January 24, 2013, Dr. Shott had not received any response from Mr. Alper or anyone else at Vedder Price to her January 21, 2013 email to Mr. Alper.

29. In a January 24, 2013 email to Mr. Alper (cc'd to Mr. Hinshaw and Mr. Rice), Dr. Shott provided Vedder Price with a PDF file containing an additional 49 pages of medical records and other medical documents, as part of discovery for the Rush discrimination case. These documents provided further verification that Dr. Shott has severe rheumatoid arthritis and pulmonary hypertension, that she is disabled within the meaning of the ADA, that she has a record of having these disabilities, and that she needs accommodations of her disabilities. In this email, Dr. Shott stated that she had not received a response to her January 21, 2013 email requesting that Vedder Price accommodate her disabilities.

30. On January 25, 2013, Mr. Alper responded to Dr. Shott's January 24, 2013 email with the following email (cc'd to Mr. Hinshaw and Mr. Rice):

Received.

Dr. Shott:

It is not appropriate for you to communicate directly with Mr. Rice. You should not send any communications directly to anyone at Rush concerning this litigation. You should communicate only with counsel of record, i.e., Scot Hinshaw and me.

31. On January 25, 2013, Dr. Shott sent Mr. Alper an email (cc'd to Mr. Hinshaw) which stated:

12

> Your latest email does not even acknowledge my request that Vedder Price accommodate my disabilities. I would greatly appreciate a response to my request.

32. On January 28, 2013, Mr. Alper responded to Dr. Shott's January 25, 2013 email with the following email (cc'd to Mr. Hinshaw):

> Dear Dr. Shott:
>
> Would you please provide for me any written restriction prepared by any physician which states that you cannot spend 7 hours in a downtown Chicago office due to air pollution.
>
> Once you provide that to me, I would be happy to consider another location for your deposition.
>
> As far as any depositions you would like to take, I have no objection to you taking them telephonically or other electronic means at your expense.
>
> Please provide me with dates when you are available to be deposed.

33. A physician cannot reasonably state that an individual with Dr. Shott's disabilities "cannot spend 7 hours in a downtown Chicago office due to air pollution," for the same reasons that a physician cannot reasonably state that an individual who is blind cannot spend 7 hours in a downtown Chicago office without his or her guide dog; or that an individual with paraplegia cannot spend 7 hours in a downtown Chicago office without his or her wheelchair. A person who is blind can be separated from his guide dog and pulled around by others to "guide" him. A person who is paraplegic can be removed from his wheelchair and carried about. Dr. Shott can be required to give a deposition in a manner that causes her severe pain and stiffness, shortness of breath, chest pain, and extreme fatigue, and severely impairs her ability to give her deposition.

34. Mr. Alper has demanded that Dr. Shott obtain such a statement from a physician even though she has given Vedder Price 440 pages of medical documents that verify her disabilities and her need for accommodations of her disabilities. After receiving such extensive

medical verification, Mr. Alper has no reasonable grounds for making such a demand, especially given that the following medical facts are well established and commonly known:

    a.    Pollution is medically harmful to individuals with serious heart disease; and

    b.    Exposure to pollution impairs the ability of individuals with heart disease to function by worsening their cardiac symptoms.

35.    Mr. Alper has provided no legitimate reason for demanding that Dr. Shott obtain such a statement from a physician. One reason he has given (in his January 18, 2013 email to Dr. Shott) is his inaccurate description of Rush's refusal to provide Dr. Shott with a reasonable accommodation of her disabilities so she can obtain her paychecks without traveling to Chicago. The fact that Rush has again violated the ADA does not entitle Vedder Price to violate Title III by refusing to accommodate Dr. Shott's disabilities. In addition, Dr. Shott picks up her paychecks in the afternoon and leaves Chicago immediately in order to reduce the physical harm caused by this trip. Picking up her paychecks is not a highly stressful activity that requires peak performance. Vedder Price is requiring Dr. Shott to travel to downtown Chicago in the morning and spend at least seven hours there while engaged in a highly stressful activity that requires peak performance.

36.    Even if Dr. Shott did not have pulmonary hypertension and substantial difficulties caused by pollution, the substantial difficulties that her rheumatoid arthritis would cause her, as described above, if she gave her deposition in the manner demanded by Vedder Price, necessitate the accommodations described above.

37.    Mr. Alper has demanded that Dr. Shott obtain such a statement from a physician before Vedder Price will even "consider" changing the location of Dr. Shott's deposition. He has not provided any assurance that Vedder Price would agree to this accommodation of Dr. Shott's

disabilities even if she did provide such a statement. Mr. Alper's response makes it clear that Vedder Price is refusing to provide the accommodation of taking Dr. Shott's deposition in a location that is closer to her home and not heavily polluted.

38. By refusing to even mention taking Dr. Shott's deposition by audio or video conferencing in his January 28, 2013 email, Mr. Alper has made it clear that Vedder Price is refusing to provide this accommodation of Dr. Shott's disabilities.

39. By refusing to even mention the possibility of taking Dr. Shott's deposition in the afternoon in his January 28, 2013 email, Mr. Alper has made it clear that Vedder Price is refusing to provide this accommodation of Dr. Shott's disabilities.

40. Mr. Alper has provided no assurance that Vedder Price will accommodate Dr. Shott's disabilities by allowing her to take depositions of Rush personnel in the afternoon.

41. Although Mr. Alper agrees, in his January 28, 2013 email, to allow Dr. Shott to take depositions of Rush personnel telephonically or by other electronic means, he makes it clear that Vedder Price will require Dr. Shott to pay for this accommodation.

42. Dr. Shott has not asked Vedder Price to make any unreasonable modifications in its policies, practices, or procedures in order to accommodate Dr. Shott's disabilities. Vedder Price could easily accommodate Dr. Shott's disabilities by arranging afternoon depositions that are taken by video or audio conferencing. Law offices frequently take depositions by video or audio conferencing because this is convenient and reduces travel costs. Law offices also frequently take depositions in the afternoon because of a deponent's schedule. Dr. Shott has asked for no more consideration than a law office would give a non-disabled deponent or attorney who could not fly across the country for a deposition, and whose work schedule would not permit a morning deposition.

43. In its conduct toward Dr. Shott, Vedder Price and its attorneys have made no good faith effort to comply with the requirements of Title III of the ADA even though they have been repeatedly alerted to those requirements by Dr. Shott.

44. Dr. Shott has been and continues to be harmed by Vedder Price's discriminatory actions. Vedder Price's refusal to accommodate her disabilities has caused her substantial stress, which has made her rheumatoid arthritis and pulmonary hypertension symptoms worse, and emotional distress.

45. Dr. Shott has reasonable cause to believe that Vedder Price's discrimination on the basis of disability in violation of Title III of the ADA raises an issue of general public importance within the meaning of 42 U.S.C. § 12188(b)(1)(B)(ii) and C.F.R. § 36.503(b).

## COUNT I
## DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT

46. Dr. Shott restates and incorporates by reference paragraphs 1-45 above as part of this Count of the Complaint.

47. Title III of the ADA provides:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation. 42 U.S.C. § 12182.

48. Vedder Price is a "place of public accommodation" under Title III of the ADA.

49. Vedder Price, by virtue of the conduct described herein, has discriminated against Dr. Shott because of her disability in violation of Title III of the ADA.

50. Vedder Price is likely to continue to refuse to accommodate Dr. Shott's disabilities.

**WHEREFORE,** Plaintiff Dr. Shott respectfully requests the following relief:

a. Declare that the discriminatory actions, practices, and policies of Vedder Price, as set forth above, violate Title III of the ADA, 42 U.S.C. §§ 12181-12189, and its implementing regulation 28 C.F.R. Part 36;

b. Enjoin Vedder Price, its officers, agents, and employees, and all other persons in active concert or participation with Vedder Price, from discriminating on the basis of disability against Dr. Shott and other individuals with disabilities in violation of Title III of the ADA, 42 U.S.C. §§ 12181-12189, and its implementing regulation 28 C.F.R. Part 36;

c. Enjoin Vedder Price, its officers, agents, and employees, and all other persons in active concert or participation with Vedder Price, from failing or refusing to adopt and implement a policy of nondiscrimination against persons with disabilities, and from failing to make reasonable modifications to policies, practices, and procedures to insure that that goods, services, facilities, privileges, advantages, and accommodations are afforded to individuals with disabilities in a nondiscriminatory manner;

d. Order Vedder Price, its officers, agents, and employees, and all other persons in active concert or participation with Vedder Price, to undergo ADA and disability awareness training;

e. Award monetary damages to Dr. Shott to compensate her for the discrimination against her by Vedder Price that she has experienced and continues to experience;

f. Assess a civil penalty against Vedder Price as authorized by 42 U.S.C. § 12188(b)(2) and 28 C.F.R. § 36.504(a)(3) in an amount sufficient to vindicate the public interest; and

g. Order such other appropriate relief as the interests of justice may require in the opinion of this Court.

Respectfully submitted,

Susan Shott
PO Box 671
Harvard, IL 60033
Telephone: (312) 203-3805

Dated: January 31, 2013

**PLAINTIFF DEMANDS A TRIAL BY JURY.**